J-A24003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MPOWER SOFTWARE SERVICES, LLC, AND MPOWER MANAGED SERVICES, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| AMERICAN WATER WORKS SERVICE COMPANY, INC., AND VIRTUAL DYNAMIX, LLC | : | No. 2598 EDA 2018 |
| | : | |
| APPEAL OF: AMERICAN WATER WORKS SERVICE COMPANY, INC. | : | |

Appeal from the Judgment Entered August 24, 2018
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2012-8193

| | | |
|---|---|---|
| MPOWER SOFTWARE SERVICES, LLC, AND MPOWER MANAGED SERVICES, LLC | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| AMERICAN WATER WORKS SERVICE COMPANY, INC., AND VIRTUAL DYNAMIX, LLC | : | No. 2763 EDA 2018 |
| | : | |
| APPEAL OF: MPOWER SOFTWARE SERVICES, LLC AND MPOWER MANAGED SERVICES, LLC | : | |

Appeal from the Judgment Entered August 24, 2018
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2012-8193

J-A24003-19

BEFORE:   BENDER, P.J.E., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED NOVEMBER 20, 2019**

Appellant, American Water Works Services Company, Inc. ("AW"), appeals and Appellees, mPower Software Services, LLC and mPower Managed Services, LLC (collectively "mPower"), cross-appeal from the August 24, 2018 judgment entered in favor of mPower following a non-jury trial.[1]  We affirm in part and reverse in part.

This case involves an intricate, convoluted contract dispute.  After the non-jury trial, which lasted several weeks, the trial court issued a comprehensive and detailed opinion containing 766 findings of fact.  In the interest of brevity, we summarize them, in most pertinent part, as follows.[2]

mPower is an information technology solutions company with a principal place of business in New Jersey, and AW is a water company with a

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] mPower Managed Services, LLC is a subsidiary of mPower Software Services, LLC.  **See** Findings of Fact and Conclusions of Law ("FFCL"), 7/1/2016, at ¶ 3. mPower Managed Services was added as a plaintiff during trial, and the trial court discerned that its claims and allegations were identical to those set forth in the complaint of mPower Software Services.  **Id.** at 2.  The trial court found that "[a]t all times during the parties' business relations … AW made no distinction between mPower Software Services and mPower Managed Services, and referred to them as 'mPower.'"  **Id.** at ¶ 7.  Similarly, "[a]t all times, through the testimony of its own witnesses, AW acknowledged that it used the name 'mPower' to mean either or both mPower Software Services and mPower Managed Services."  **Id.** at ¶ 8.  Thus, unless otherwise specified, we also refer to either or both of these entities as "mPower."

[2] When necessary, in our analysis of the parties' issues *infra*, we provide further facts relevant to specific issues.

- 2 -

headquarters in New Jersey. *See* FFCL at ¶¶ 1, 2, 6. In 2010, AW contacted mPower and requested that it develop a business plan to determine the costs for the total migration of AW's computer network to a new Windows operating system, and assist it with other issues related to infrastructure. *Id.* at ¶ 11.

On October 1, 2010, mPower and AW entered into a contract referred to as the 'Master Services Agreement' ("MSA"), which was drafted by AW and set forth the general terms and conditions of the work AW expected mPower to complete. *Id.* at ¶¶ 12-14. Under the MSA, the parties agreed to enter into 'Statements of Work' ("SOW"), which governed the terms, conditions, scope of work, and compensation for various projects and — pursuant to AW's policy — could only last for a period not greater than one year. *Id.* at ¶¶ 20-21. The SOWs introduced work and defined the terms for projects, and mPower performed its actual work pursuant to the individual SOW. *Id.* at ¶¶ 26-27. In addition, AW had a policy that any change to an SOW required a 'Project Change Request' ("PCR"), detailing the nature, reason, and impact of the proposed change. *Id.* at ¶¶ 29-32. AW employees had the responsibility of ensuring that a PCR was signed to cover all work performed, but not originally included, in an SOW. *Id.* at ¶ 34. As a federally regulated company, AW was required to have SOWs and PCRs in place before any vendor, including mPower, performed work for it. *Id.* at ¶¶ 35, 36. In order for mPower to begin work while the parties finalized the terms of unexecuted PCRs or SOWs, the parties executed a 'Letter of Intent' ("LOI"), which was a short-term 'work order' that helped them better transition between projects. *Id.* at ¶¶ 41, 43-

44. Despite these policies and requirements, the parties frequently entered into verbal agreements for work, which AW expected mPower to perform. *Id.* at ¶ 39. AW authorized mPower to begin work on occasion without any signed SOW, PCR, LOI, or other written documentation in place, and AW never requested that mPower not perform the expected work because of any unsigned documents. *Id.* at ¶¶ 46, 48.

AW was so satisfied with mPower's initial work that it made mPower the sole vendor for its 'Enterprise Image Deployment' ("EID") project, which was expected to last numerous years and involved transitioning AW's computer system to a new Windows Operating System. *Id.* at ¶¶ 18, 19, 24. For this project, mPower had to work with 18 of AW's company departments. *Id.* at ¶ 57.[3] As part of the EID project, AW was obligated to identify an AW employee from each of these 18 departments to work jointly with mPower personnel to decide which applications would be kept or removed from each of the department's systems. *Id.* at ¶¶ 58-60. This process of mPower's meeting with an AW employee and making decisions regarding applications would typically take a few hours, and mPower could not perform its work until an AW employee made decisions on applications. *Id.* at ¶¶ 61, 62.

On or about February 21, 2012, pursuant to the MSA, the parties executed SOW 6, the most complex and time-intensive SOW. *Id.* at ¶¶ 86, 87, 117. Under SOW 6, mPower was to 'standardize' AW's software

---

[3] These company departments are also known as 'lines of business' or 'LOBs'. *See* FFCL at ¶¶ 54, 56.

application library — *i.e.*, determine whether a department should keep or retire an application — in connection with the EID project. *Id.* at ¶¶ 64, 91. mPower's standardization work pursuant to SOW 6 was a continuation of the same work it completed pursuant to earlier SOWs — namely SOW 2 — and some of the completion criteria under these SOWs overlapped. *Id.* at ¶¶ 92, 93. Accordingly, for the reasons described *supra*, mPower continued to have to rely on AW's cooperation and employees to perform its work. *Id.* at ¶ 120.

SOW 6 contained several notable provisions. Section 3.3 of SOW 6 set forth that, if either party requested a change affecting schedule, quality, resources, or price, the parties needed to complete a PCR for the change. *Id.* at ¶ 95. Nevertheless, despite this language, "the parties agreed by conduct and verbally[] to operate without signed PCRs." *Id.* at ¶ 96. Additionally, Section 5.0 of SOW 6 governed 'Milestones and Deliverables,' which were completion criteria or tangible objects that the parties could identify to demonstrate that mPower completed work, met the milestones, and was entitled to payment. *Id.* at ¶¶ 105, 108. In short, the work product that AW purchased from mPower constituted a deliverable, and the completion of a task comprised a milestone. *Id.* at ¶ 109. Specifically, Section 5.1 of SOW 6 addressed 'Milestones,' and provided that "[u]pon completion of each milestone, [mPower] will issue a milestone completion letter … for approval by [AW]. [mPower] will invoice [AW] for each milestone payment upon receipt of the respective executed milestone completion letter." *Id.* at ¶ 106 (footnote omitted; some brackets added). Because of this provision, AW

completely controlled the process of approving milestone completion letters. *Id.* at ¶ 112.

Under SOW 6, AW agreed to pay mPower approximately $3.7 million. *Id.* at ¶ 116. AW insisted that mPower agree to perform SOW 6 on a fixed-price basis, where mPower had to provide certain deliverables and milestones before it would receive payment. *Id.* at ¶¶ 118, 119. Thus, SOW 6 required mPower to incur substantial up-front costs, as it "was a back-loaded contract that withheld all payment to mPower until AW gave its final approval of the milestones, even when work was completed." *Id.* at ¶ 122.

In December of 2011, after mPower and AW had already negotiated and drafted the majority of SOW 6's terms, AW hired Fred Lamb. *Id.* at ¶¶ 123, 124. Lamb served as the 'Lead Technical Manager' of SOW 6, which resulted in Lamb's being in charge of SOW 6, and acting as the gatekeeper in determining whether mPower completed its work. *Id.* at ¶¶ 125, 127. After Lamb reviewed mPower's work under SOW 6, he would report and provide updates to Phyllis Garelick, the 'Project Manager' for SOW 6. *Id.* at ¶¶ 103, 128. At the time Lamb joined AW, mPower and AW had already established and followed a process for the standardization work mPower was performing under SOW 2 and SOW 6. *Id.* at ¶ 129. However, in August of 2011, employees at AW became concerned that the EID project was over budget, though it was through no fault of mPower. *Id.* at ¶¶ 130-32.[4]

---

[4] Indeed, in January of 2012, the EID project was over budget by about $1.1 million. FFCL at ¶ 131.

While mPower was working on the EID project, AW was concurrently performing work on another, separate project that would impact AW's entire computer environment and all of its employees, known as the 'Business Transformation' ("BT") project. *Id.* at ¶¶ 133-34, 136. In addition to the EID project, Lamb was also in charge of this BT project. *Id.* at ¶ 135. Lamb, Garelick, and other AW employees conveyed to mPower that the BT project was a higher priority to AW than the EID project. *Id.* at ¶ 138. The BT project cost AW about $300 million while the EID project cost it only around $3.7 million. *Id.* at ¶ 139.

The BT project had an accelerated timeline, and AW fell behind schedule on it. *Id.* at ¶¶ 140-41. AW set the launch date for the BT project as August 1, 2012. *Id.* at ¶ 159. Because AW did not possess the personnel or capabilities to complete such a large, complex project independently, AW transferred mPower personnel working on the EID project to the BT project. *Id.* at ¶¶ 142, 143. Lamb had asked mPower if it could allocate some of its resources (namely, people and their time) away from the EID project to the BT project, and mPower agreed to do so. *Id.* at ¶¶ 152, 153. In addition, AW pulled away various people at AW from the EID project to the BT project, even though those people were supposed to be working on the EID project or otherwise assisting mPower. *Id.* at ¶¶ 146, 147. The diversion of mPower personnel to assist on the BT project, as well as the lack of availability of AW employees to collaborate with mPower on the standardization process, obstructed mPower's ability to complete its work under SOW 6. *See id.* at ¶¶

147-63. During this time, it also became increasingly difficult for mPower to finish and receive payment for its work, as AW controlled the process of approving milestone completion letters and invoices. *Id.* at ¶ 164.

Due to the stress of the BT project and the higher-than-expected cost of the EID project, soon after Lamb took control of SOW 6 and the BT project, AW developed a plan to remove mPower and deprive it of its contracts. *Id.* at ¶¶ 166, 167. AW purposefully began taking steps to hinder mPower's ability to complete its contracted work, while simultaneously securing mPower's help on the BT project. *Id.* at ¶ 169. AW's plan aimed to prevent mPower from collecting money AW owed to it pursuant to, *inter alia*, the MSA, SOWs, and PCRs, as AW received mPower's free labor on the BT project. *Id.* at ¶ 170. To effect this plan, AW (i) changed previously agreed-upon objectives and processes;[5] (ii) obstructed mPower's ability to complete work;[6] (iii) failed to

---

[5] More specifically, "[w]hen Lamb became in charge of the EID project, he repeatedly changed the scope and objectives for [the] completion of the project without signed PCRs." FFCL at ¶ 172 (footnote omitted). "mPower performed the work outside the scope of the parties' agreed[-]upon projects, at the requests of Lamb." *Id.* at ¶ 180. "Lamb threatened mPower by saying that [its] SOW 'was at risk' if [it was] not completing work AW requested that it complete, which was not part of SOW 6." *Id.* at ¶ 191 (footnote omitted).

[6] For instance, "knowing that its approval was required before mPower could issue milestone completion letter[s] and invoices, AW refused to provide requisite approvals for payment." FFCL at ¶ 199. In fact, in May of 2012, "AW instructed mPower to stop submitting certain milestone completion letters, despite mPower['s] having completed the work." *Id.* at ¶ 203 (footnote omitted). Additionally, "Lamb's … spontaneous requested edits, changes, or revisions obstructed mPower's ability to submit milestone letters to receive payment." *Id.* at ¶ 208.

timely provide essential resources;[7] and (iv) failed, or otherwise intentionally disregarded, its obligation to maintain control over its project governance.[8] *Id.* at ¶ 171.

Notwithstanding AW's efforts to obstruct mPower's work, mPower and its personnel continued to act in good faith and made reasonable attempts to collaborate with AW to finish requested work to the satisfaction of the contracts and AW. *Id.* at ¶¶ 254, 255. Several AW employees testified that mPower acted in good faith, and worked in a timely and sufficient manner. *Id.* at ¶ 261. In addition, the testimony of mPower staff established that working with Lamb and other AW personnel was extremely difficult and unpleasant. *Id.* at ¶ 259.

On July 31, 2012, the day before the BT project's launch date, mPower employees arrived at AW's premises, where AW unexpectedly terminated mPower "for convenience" and escorted its employees off the premises. *Id.* at ¶ 286. On that same day, AW sent a termination letter to mPower, where it informed mPower that the termination was effective August 14, 2012. *Id.* at ¶¶ 288-93. Nevertheless, in addition to immediately escorting mPower employees off the premises on July 31, 2012, AW confiscated their computers,

---

[7] By way of example, "AW hindered and otherwise delayed mPower's ability to complete its work by not providing information and people necessary for mPower to be able to complete the work." FFCL at ¶ 221 (footnote omitted).

[8] To elaborate, "[d]espite only being the Tech Lead on SOW 6, AW purposefully allowed Lamb to singularly and independently interpret, enforce, change, and approve project deliverables and payments to mPower." FFCL at ¶ 247.

and denied them access to any work relating to their projects with AW. *Id.* at ¶ 293. Although mPower requested access to computers and other devices containing their work, AW did not grant it. *Id.* at ¶ 302.

In the attachments to the termination letter AW sent to mPower, AW stated that it owed mPower only $351,362 for the work it completed, which represented only a fraction of the amount AW actually owed mPower. *Id.* at ¶¶ 297, 298. Because of AW's obstructive conduct, mPower did not entirely finish its work under SOW 6, but had completed nearly all of it. *Id.* at ¶¶ 300, 301. The termination letter and its attachments did not mention that mPower had an inability to finish work or that mPower should pay back money for work it poorly performed. *Id.* at ¶ 303.

Thereafter, mPower and AW engaged in the dispute resolution/escalation process outlined in the MSA. *Id.* at ¶ 304. During one of the final meetings between the parties, AW told mPower that "if [mPower] decided to pursue [its claim] legally, [AW] would make it long, painful, expensive [and] would tell [mPower's] vendors or clients that [its] the type of vendor that likes to sue them." *Id.* at ¶ 305 (footnote omitted; some brackets added).

Notwithstanding this threat, on September 17, 2012, mPower Software Services filed a complaint against AW, wherein it alleged causes of actions for breach of contract, breach of the duty of good faith and fair dealing, and unjust enrichment. *Id.* at 1. AW subsequently filed an Answer, New Matter, and Counterclaims to mPower's complaint, advancing causes of action for breach

of contract, breach of the duty of good faith and fair dealing, and fraudulent inducement. *Id.*[9] Prior to trial, the trial court dismissed mPower's unjust enrichment claim, and AW withdrew its fraudulent inducement claim. *Id.* at 2. The non-jury trial began on January 19, 2016, and the parties proceeded to present 12 live witnesses, 7 witnesses by deposition designations, and around 400 total exhibits. *Id.* at 1.

On July 1, 2016, the trial court rendered its verdict, finding in favor of mPower and against AW with respect to mPower's breach of contract and breach of duty of faith and fair dealing claims. Additionally, the trial court found in favor of mPower and against AW with respect to AW's remaining counterclaims. As a result, it awarded mPower damages in the total amount of $2,244,549.00, and ordered that "all statutory interest is to be included on the foregoing damages from August 1, 2012, to the date [j]udgement [*sic*] is entered." *See* Order, 7/1/2016, at 1.[10] Moreover, the trial court awarded mPower legal fees and expenses, and directed it to file an itemized accounting of all fees and costs it incurred. *Id.* at 3.

_____

[9] mPower then filed a third-party complaint against Virtual Dynamix, LLC — who it had hired to do certain work — averring causes of action against it for contractual indemnification, common law indemnification, breach of contract, and contribution. FFCL at 2; *see id.* at ¶¶ 480-85. At trial, via a motion for nonsuit, the trial court dismissed all claims against Virtual Dynamix. *Id.* at 2. Virtual Dynamix did not file an appellate brief in this matter, as it discerned that none of the issues on appeal pertains to it.

[10] In that order, the trial court also provided a breakdown of how it reached a total of $2,244,549.00 in damages.

Following the entry of its verdict on July 1, 2016, the trial court

summarized the post-trial procedural history of this matter, as follows:

> On July 11, 2016, mPower filed an [i]temized [a]ccounting of [a]ll [f]ees and [c]osts as directed by this [c]ourt's July 1, 2016 [o]rder. Also on July 11, 2016, mPower filed a [m]otion for [p]ost-[t]rial [r]elief to [m]old the [v]erdict to [i]nclude [p]re-[j]udgment and [p]ost-[j]udgment [i]nterest.[11] On July 15, 2016, AW filed a [m]otion for [p]ost-[t]rial [r]elief.
>
> On July 21, 2016, AW filed an [a]nswer to [mPower's] [m]otion to [m]old the [v]erdict to [i]nclude [p]re-[j]udgment and [p]ost-[j]udgment [i]nterest.
>
> On August 1, 2016, AW filed a [r]esponse in [o]pposition to [mPower's] [f]ee [a]pplication. On September 9, 2016, this [c]ourt entered two separate [o]rders denying both mPower's and AW's [m]otions for [p]ost-[t]rial [r]elief. On September 12, 2016, this [c]ourt entered an [o]rder awarding mPower reasonable attorney[s'] fees in the amount of [$3,596,071.35,] and costs in the amount of [$445,806.16,] incurred in connection with this litigation.
>
> On September 23, 2016, mPower filed a *praecipe* to [e]nter [j]udgment against AW pursuant to this [c]ourt's July 1, 2016 and September 12, 2016 [o]rders. On September 27, 2016, the Bucks County Prothonotary entered judgment in the amount of [$6,844,620.49] against AW.[26] This [c]ourt had not yet ruled on mPower's [p]ost-[t]rial [m]otion to [m]old the [v]erdict to include [p]re-[j]udgment and [p]ost-[j]udgment [i]nterest.
>
> > [26] This [j]udgment amount was entered based on mPower's September 23, 2016 *praecipe* to [e]nter [j]udgment and miscalculated the pre-judgment interest by applying it until September 23, 2016[,] instead of July 1, 2016, the date this [c]ourt entered its [v]erdict.
>
> On October 4, 2016, AW filed a [p]etition to [s]trike the [j]udgment entered on September 27, 2016.[27]

---

[11] In addition to mPower's motion to mold the verdict to include pre-judgment and post-judgment interest, mPower separately filed a motion for post-trial relief, raising other issues.

[27] [T]his [c]ourt did not render a decision on AW's October 4, 2016 [p]etition to [s]trike [j]udgment because this [c]ourt determined it no longer had jurisdiction to consider it once AW filed its [n]otice of [a]ppeal with the Superior Court on October 7, 2016. On December 14, 2016, AW filed an additional [n]otice of [a]ppeal to the Superior Court of the letter [o]rder[,] dated November 15, 2016, where this [c]ourt declined to take action on AW's [m]otion to [s]trike [j]udgment. [] 3876 EDA 2016.[12]

On October 7, 2016, AW filed a [n]otice of [a]ppeal to [the] Superior Court of this [c]ourt's September 12, 2016 [o]rder granting mPower reasonable attorney's fees and costs.[28] Also on October 7, 2016, AW filed a separate [n]otice of [a]ppeal to the Superior Court of this [c]ourt's [v]erdict in favor of mPower.[29] On October 25, 2016, mPower filed a [n]otice of [c]ross [a]ppeal from several [o]rders and [j]udgments entered during the litigation.[30]

[28] 3156 EDA 2016.

[29] 3157 EDA 2016. On November 18, 2016, [the Superior Court quashed] AW's appeal at … 3157 EDA 2016, stating it is duplicative and unnecessary as an appeal had already been taken at … 3156 EDA 2016. The Superior Court directed AW to raise any issue contained in the appeal at … 3157 EDA 2016 within the appeal at … 3156 EDA 2016.

[30] 3541 EDA 2016.

On January 5, 2017, this [c]ourt filed an [o]pinion in [s]upport of its [v]erdict and [o]rders in this case under Pa.R.A.P. 1925(a).

On February 1, 2017, the Honorable Judge Diane Gibbons entered a [s]upplemental [Rule] 1925(a) [o]pinion addressing four of mPower's appeal issues pertaining to issues raised regarding orders Judge Gibbons issued during the pre-trial phase of this case.

On March 17, 2017, the Superior Court of Pennsylvania entered a quashal order on AW and mPower's [a]ppeals. On October 23, 2017, the Supreme Court of Pennsylvania remanded this matter to the Superior Court for an explanation of the rationale underlying the quashal order dated March 17, 2017.[34]

_____

[12] We quashed this appeal on March 16, 2017.

[34] 354 MAL 201[7].

On November 28, 2017, the Superior Court entered an [o]rder in response to the Supreme Court of Pennsylvania's request for its rationale. The Superior Court explained it quashed the [a]ppeals by AW and mPower because a final judgment had not been entered on the docket since this [c]ourt had not yet ruled on mPower's [m]otion to [m]old the [v]erdict to include [p]re-[j]udgment and [p]ost-[j]udgment [i]nterest.

On April 3, 2018, the Supreme Court of Pennsylvania entered an [o]rder [d]enying the [p]etition for [a]llowance of [a]ppeal.

On August 7, 2018, this [c]ourt entered judgment in favor of mPower and against AW on the [o]rders dated July 1, 2016[,] and September 12, 2016[,] in the amount of [$6,814,079.90].[37]

[37] This [c]ourt's August 7, 2018 [o]rder included: (1) the [v]erdict for $2,244,549.00; (2) [p]re[-]judgment interest (statutory) from … August 1, 2012 … until the July 1, 2016 [v]erdict totaling $527,652.99; (3) [l]egal fees of $3,596,071.75; and (4) expenses of $445,806.16. This [o]rder allowed [mPower] to make one or more additional applications to be reimbursed by [AW].

On August 7, 2018, this [c]ourt also entered an [o]rder on mPower's [m]otion for [p]ost-[t]rial [r]elief to mold the July 1, 2016 [v]erdict to [i]nclude [p]re-[j]udgment and [p]ost-[j]udgment [i]nterest. This [c]ourt [o]rdered the [v]erdict to be molded with pre-judgment interest in the amount of [$527,652.99,] and post-judgment interest that shall accrue on the total judgment of [$2,722,201.99,] at the rate of [6%] per annum beginning October 23, 2017 until the date the judgment is satisfied.[39][, 13]

[39] This [c]ourt [o]rdered that mPower is not entitled to post-judgment interest for the period beginning September 27,

[13] The trial court also directed that post-judgment interest shall accrue on the $4,041,877.91 in fees and costs it awarded.

2016 (the date mPower improperly *praeciped* the July 1, 2016 [v]erdict) to October 23, 2017.[14]

On August 24, 2018, the Office of the Prothonotary entered [j]udgment on the August 7, 2018 [o]rders.[40]

[40] [T]he Office of the Prothonotary vacated this [c]ourt's September 27, 2016 judgment in favor of mPower.

TCO at 3-6 (headings, some footnotes, and some citations omitted).

On September 5, 2018, AW filed a timely notice of appeal from the August 24, 2018 judgment, docketed at 2598 EDA 2018. With its notice of appeal, AW simultaneously filed a concise statement of errors complained of on appeal pursuant to Rule 1925(b). In addition, on September 19, 2018, mPower filed a timely notice of cross appeal, docketed at 2763 EDA 2018, and a Rule 1925(b) concise statement. The trial court issued its Rule 1925(a) opinion on December 7, 2018.

Presently, AW advances the following three issues on appeal:

1. Where the parties had a written agreement that included a comprehensive procedure for modifying it, did the trial court err in disregarding that contract and mixing tort and contract principles such that it (a) awarded damages for which there was no record support; (b) awarded damages related to unpleaded and unproven oral contracts; and (c) concluded that the same

---

[14] Later, however, the trial court acknowledged that it "erred in both of its August 7, 2018 [o]rders when it ended the period of post-judgment interest on October 23, 2017[,] instead of April 3, 2018." Trial Court Opinion ("TCO"), 12/7/2018, at 19. It explained that "AW should not be required to pay post-judgment interest on either the verdict or the attorney[s'] fees and expenses for the dates between September 27, 2016 (when mPower improperly *praeciped* this [c]ourt's July 1, 2016 verdict) and April 3, 2018 (when the [Pennsylvania] Supreme Court denied the appeal petition and remitted the case to the Superior Court for remand to this [c]ourt)." **Id.**

conduct constituted both a breach of contract and a breach of the duty of good faith and fair dealing?

2. Did the trial court err in awarding all requested costs and attorneys' fees when such an award was (a) not authorized by the parties' contract or applicable law; and (b) disproportionate, unreasonable, and predicated on assumptions that were not borne out in the opinion by the judge who oversaw the pretrial process?

3. Did the trial court err when it included post-judgment interest for a portion of the time when, due to [mPower's] filing of a defective *praecipe*, the trial court could not enter a valid judgment that could be reviewed on appeal?

AW's Brief at 5.

mPower raises the following three issues on appeal:

[1.] Did the trial court err in calculating post-judgment interest where (a) post-judgment [interest] is mandatory and not subject to a trial court's discretion; and (b) AW's conduct caused a nineteen month delay?

[2.] Did the trial court abuse its discretion when it awarded mPower damages for packaging only 29 applications, where the competent evidence establishes mPower packaged 135 applications?

[3.] Alternatively, if this Court determines the trial court erred in awarding mPower damages under an oral contract theory, did the trial court err by dismissing mPower's unjust enrichment claim and denying mPower's Motion to Amend its Complaint?

mPower's Brief at 2-3.

We will address AW's issues first. At the outset, we acknowledge that New Jersey substantive law applies to this case. *See* FFCL at 95 n.636 (stating that the MSA provides that it should be "interpreted, construed, and governed by the laws of the State of New Jersey without regard to conflict of law principles thereof").

**AW's First Issue**

In its first issue, AW claims that "[t]he damages award was contrary to the MSA, the record, and the applicable law."  AW's Brief at 22 (unnecessary capitalization and emphasis omitted).  In sum, it argues:

> As for the verdict, it rests on errors of fact and law.  Factually, [the trial court] erred by (a) awarding damages twice for the same task; (b) awarding damages for tasks never completed; and (c) awarding damages for work completed pursuant to a contract (SOW 2) that was not at issue.  Legally, [the trial court] erred by (a) awarding damages for supposed "oral contracts" that were neither pleaded nor proved; and (b) imposing liability for the exact same conduct under *both* the law of contract and the duty of good faith and fair dealing.

*Id.* at 20 (emphasis in original).  We address each of these contentions in turn.

> We apply the following standard of review:

> Our appellate role in cases arising from non[-]jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law.  The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury.  We consider the evidence in a light most favorable to the verdict winner.  We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.  However, where the issue … concerns a question of law, our scope of review is plenary.

> The trial court's conclusions of law on appeal originating from a non-jury trial "are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts" of the case.

***Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.***, 53 A.3d 53, 60-61 (Pa. Super. 2012) (citation and brackets omitted).[15]

In part (a) of AW's first issue, AW insists that the trial court awarded damages for which there was no record support. AW's Brief at 5. To begin, AW alleges that the trial court "double-counted damages related to three different SOW 6 projects, thereby inflating the verdict by $496,076." ***Id.*** at 23. With respect to the initial SOW 6 project that AW challenges — called the "Application Standardization" project — AW says that SOW 6, as originally structured, "required mPower … to perform several different functions for the computer applications in each of [AW's] 18 lines of business." ***Id.***[16] AW argues that the trial court "awarded $410,076 ($22,782 for each of the 18 lines of business) based on the mistaken assumption that mPower had completed the entire standardization project under the original terms of SOW 6." ***Id.*** (internal quotation marks omitted). However, AW asserts that, "[i]nstead of 18 completed sets of already-standardized applications, the parties agreed that mPower … would provide [AW] with a documented *process* for performing application standardization and would demonstrate that process across three lines of business." ***Id.*** at 24 (footnote omitted; emphasis

---

[15] Both parties agree that the standard of review of the law of the forum, *i.e.*, Pennsylvania, applies. ***See*** AW's Brief at 4; mPower's Brief at 1. Accordingly, we employ it.

[16] We reiterate that the lines of business, or LOBs, are company departments at AW. ***See*** FFCL at ¶¶ 54, 56, 57.

in original). It explains that, "[c]onsequently, rather than the 18 standardization-related milestones in SOW 6 …, the [Standardization Process] PCR contained only four milestones…. mPower … should not have been paid under both the original (superseded) SOW *and* the PCR that supplanted it." *Id.* (footnote omitted; emphasis in original).[17]

The evidence that AW points to does not convince us that the trial court erred in finding that the Standardization Process PCR did not replace the original standardization terms of SOW 6. In its principal brief, AW directs us to two of mPower's exhibits containing versions of the Standardization Process PCR. *See* AW's Brief at 24 (referencing mPower's Exhibits 43 and 46). AW emphasizes that these PCRs contained only 4 milestones, instead of the original 18 milestones. *Id.* However, in the 'Description of Change' section of these PCRs, there is no indication that the original milestone requirements were replaced, which supports the trial court's finding that the Standardization Process PCR was in addition to the original standardization work under SOW 6. *See* mPower's Exhibits 43 and 46. Further, the 'Reason for the Change' section of these PCRs conveys that this revision was made because the "[p]revious requirements for delivery of an Application Standardization model were not comprehensive enough to accommodate new [AW] requirements for

---

[17] The trial court determined that the value of mPower's work pursuant to the Standardization Process PCR amounted to a total of $407,837. *See* FFCL at 120.

an end-to-end process." *Id.* This reasoning also does not convince us that the Standardization Process PCR totally supplanted the original standardization work under SOW 6.[18] Thus, competent evidence supports the trial court's finding, and no relief is due on this basis.

Next, for the other two SOW 6 projects that AW complains of, AW argues that "with regard to the 'Enterprise Image' and 'Application Remediation' milestones, the parties agreed that a different 'T&M SOW' should replace both of those milestone categories." AW's Brief at 25 (footnote omitted). It contends that, "[a]lthough the court awarded … $119,000 for the T&M SOW, it *also* awarded the full value of both the Enterprise Image milestone and Application Remediation milestone that the T&M SOW had *replaced*. That inflated the verdict by $86,000." *Id.* (emphasis in original; footnote omitted).

We deem this issue waived. Although AW claims to have preserved it in its post-trial motion, *see id.* at 23 n.14, the citation it provides does not demonstrate that it raised this specific issue therein. *See Crespo v. Hughes*, 167 A.3d 168, 181 (Pa. Super. 2017) ("Pa.R.Civ.P. 227.1 requires parties to file post-trial motions in order to preserve issues for appeal. If an issue has not been raised in a post-trial motion, it is waived for appeal purposes.")

---

[18] The evidence that AW relies on in its reply brief also does not persuade us. *See* AW's Reply Brief at 4. mPower's Exhibit 89 is an August 15, 2012 calendar entry — *i.e.*, made *after* AW had terminated mPower — by AW's Phyllis Garelick. Further, AW's citation to mPower's Exhibit 251, which states that "implementation of the activities associated with these milestones … will be replaced by the milestones listed in this change request[,]" appears to refer to a different set of milestones, namely URM1-URM18. *See id.* at 4 n.3; mPower's Exhibit 251.

(citations omitted); *see also* Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information."). Accordingly, AW has waived this claim by not raising it in its post-trial motion.

In addition to its double damages argument, AW asserts that the trial court also awarded damages for which there was no record support because the trial court "awarded damages related to work that was never completed." AW's Brief at 26 (unnecessary capitalization, emphasis, and footnote omitted). AW says that "SOW 6 did not obligate [AW] to pay for work related to milestones that were not completed[,]" and claims that the trial court "awarded damages that related to milestones for which mPower … never provided the required contractual deliverables or satisfied the required completion criteria." *Id.* (footnote omitted)

To support this argument, AW meagerly cites one case in a footnote for the principle that "it is not the function of the court to rewrite or revise an agreement when the intent of the parties is clear. Stated differently, the parties cannot expect a court to present to them a contract better than or different from the agreement they struck between themselves." *Id.* at 28 n.34 (citing ***Quinn v. Quinn***, 137 A.3d 423, 429 (N.J. 2016)). AW does not specifically address, nor provide a legal argument countering, the trial court's

rationale that, "[u]nder contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of contract." FFCL at 98 (citing ***Totaro, Duffy, Cannova, and Co., L.L.C. v. Lane, Middleton & Co., L.L.C.***, 921 A.2d 1100, 1107 (N.J. 2007)); ***see, e.g.***, ***id.*** at 102 ("AW, by and through its employees (including Lamb), by its actions, conduct, and words, completely disregarded and breached the written terms of the MSA, PCR, and SOW contracts, including SOW 6."); ***id.*** at 112 ("AW breached SOW 6 by obstructing mPower's ability to complete the Peripheral Library work. mPower performed this work near completion. … AW obstructed mPower's ability to complete this work by not giving mPower the ability to get its resources through AW's security lab and not providing the necessary servers"). It also does not respond to the trial court's findings that mPower would have completed the contract in its entirety but for AW's efforts in precluding them from doing so. ***See, e.g.***, FFCL at 108 ("AW failed to review certain applications which kept mPower from completely finishing the work. … But for AW's conduct (or lack thereof), all of the Standardization work under these Milestones would have been completed."). Accordingly, we consider this argument waived, as AW's discussion lacks any meaningful legal analysis rebutting the trial court's reasoning. ***See In re S.T.S., JR.***, 76 A.3d 24, 41-42 (Pa. Super. 2013) ("It is well settled that the argument portion of an appellate brief must be developed with pertinent discussion of the issue, which includes citations to relevant authority. … [M]ere issue spotting without

analysis or legal citation to support an assertion precludes our appellate review of a matter.") (citations and internal quotation marks omitted).

Additionally, AW states that there was no record support for the trial court's awarding "$23,600 in damages for the supposed breach of a contract (SOW 2) that was neither breached nor even at issue." AW's Brief at 28 (unnecessary capitalization, emphasis, and footnote omitted). AW avers that mPower's "[c]omplaint and [a]mended [c]omplaint both affirmatively alleged that SOW 2 had been paid in full[,]" and that "its own witness at trial testified that it was seeking damages only under SOW 6, not SOW 2." *Id.* (citations and footnote omitted). AW additionally observes that the trial court ruled that it was only allowing evidence regarding SOW 2 as "background necessary to understand SOW 6." *Id.* at 28-29 (citations omitted). Thus, AW contends that the trial court erred in this respect.

Again, we consider this argument waived. AW makes no attempt in its principal brief to explain why it believes that the $23,600 in damages arose from work mPower pursued under SOW 2. *Id.* at 28-29. Instead, it treats it as an indisputable conclusion, and argues that those damages cannot stand because mPower did not plead or pursue damages under SOW 2. *Id.* In contrast, the trial court represented that it awarded damages because a verbal contract existed between the parties to build certain computers, not due to SOW 2. *See* FFCL at 106 ("AW verbally directed … mPower to perform the work, mPower explicitly agreed to perform the offered work…, and the parties knew the terms of the agreement as they were ascertainable with reasonable

certainty.") (footnotes and internal quotation marks omitted).[19]  Likewise, mPower argues that the trial court's award of damages of $23,600 arose from a breach of a PCR, not SOW 2.  mPower's Brief at 39.  Because AW does not adequately articulate why it contends that the $23,600 in damages were awarded pursuant to SOW 2, we decline to review this issue. ***Commonwealth v. Beshore***, 916 A.2d 1128, 1140 (Pa. Super. 2007) ("We shall not develop an argument for [the appellant], nor shall we scour the record to find evidence to support an argument; consequently, we deem this issue waived.").

In part (b) of its first issue, AW argues that the trial court "awarded damages related to unpleaded and unproven oral contracts…."  AW's Brief at 5.  It contends that "oral contracts were never alleged in an operative pleading[,]" and that "[a]t no time before or during trial did [AW] have any reason to believe that an oral-contract theory of liability was at issue in this action."  ***Id.*** at 31, 33-34.  Additionally, AW states that, "even if [mPower] had pleaded claims under supported oral contracts, such claims would have been irreconcilably inconsistent with the *written* contract" given the PCR process it required.  ***Id.*** at 34 (emphasis in original).  Last, AW says that, "even if we pretend that there had not been a written contract, or that the law allowed the court to simply ignore that contract, [the trial court] still erred because [it] made no meaningful attempt to explain what the material terms

---

[19] The trial court seemingly relied on the December 15, 2011 PCR to establish that mPower charged $675 to build a machine.  FFCL at 106-07.

of the supposed oral contracts were, let alone when and how the parties had agreed to them." *Id.* at 35.

Regarding AW's claim that mPower did not allege oral contracts in its operative pleading, AW cites to *McShea v. City of Philadelphia*, 995 A.2d 334 (Pa. 2010), which provides:

> Pennsylvania is a fact-pleading state. As a minimum, a pleader must set forth concisely the facts upon which his cause of action is based. The complaint must not only apprise the defendant of the claim being asserted, but it must also summarize the essential facts to support the claim.
>
> [Pa.R.C.P.] 1019(a) requires that "[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). "Each cause of action and any special damage related thereto shall be stated in a separate count containing a demand for relief." *Id.*, 1020(a).

*McShea*, 995 A.2d at 339-40 (some internal citations and quotation marks omitted); *see also* AW's Brief at 30.

> Further, we observe that,
>
> [w]hile our rules require the pleading of all material facts upon which claims are based, there is no requirement to plead the evidence upon which the pleader will rely to establish those facts. We have long recognized that "the line between pleading facts and evidence is not always bright[,]" but distilled the specificity requirement into two conditions that "must always be met: [t]he pleadings must adequately explain the nature of the claim to the opposing party so as to permit him to prepare a defense and they must be sufficient to convince the court that the averments are not merely subterfuge." To assess whether a claim has been pled with the requisite specificity, the allegations must be viewed in the context of the pleading as a whole.

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1029-30 (Pa. 2018) (internal citations omitted).

The Supreme Court of New Jersey has identified the essential elements for a breach of contract claim as follows:

[F]irst, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of the contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]."

*See, e.g.*, *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016) (citations omitted; brackets in original).

Here, in mPower's complaint, it alleged, *inter alia*, that AW sought "to impose burdensome and expensive obligations on mPower notwithstanding that they were not mPower's responsibility under SOW 6…."  Complaint, 9/17/2012, at ¶ 28(d).  mPower averred that "Lamb … routinely imposed and required revisions and changes which added no value to the work performed and improperly disapproved of work, which had been approved by others within various business units of [AW]." *Id.* at ¶ 31.  Further, it advanced that AW "continued to change the scope and objectives for completion of the project through [PCRs].  [AW,] however, impeded the progress or ability to formally execute the PCRs.  During this time, mPower continued to work in good faith to complete the work which was represented in the PCRs." *Id.* at ¶ 38.  It asserted that, "[b]y reason of [AW's] obstruction, interference, bad faith and breaches of contract…, mPower has directly and proximately been caused … the following harm and damages: b. [v]alue of work performed pursuant to SOW 6 and agreed-upon project changes…." *Id.* at ¶ 49(b).  In

its first count — entitled breach of contract — mPower claims that AW "further breached SOW 6 by orally agreeing to changes to the scope of the work where it directed mPower to proceed with the work and then failed to execute PCRs associated with such work." *Id.* at ¶ 61.

We determine that these allegations adequately plead breach of written and oral contracts. Specifically, the complaint provided that the parties orally agreed to certain project changes but AW failed to execute corresponding PCRs, mPower worked in good faith to complete the agreed-upon project changes, AW impeded mPower's work and refused to pay it for such work, and mPower suffered damages as a result.

AW insists that, even if mPower had pleaded claims under oral contracts, such claims would have been inconsistent with the written contract. AW's Brief at 34. To support this argument, AW references one case — ***Coolidge & Sickler v. Regn***, 80 A.2d 554, 557 (N.J. 1951) — for the principle that "in the construction of contracts … the court must, if possible, ascertain and give effect to the mutual intent of the parties." AW's Brief at 34-35. We consider this single citation insufficient to support the argument lodged by AW, and therefore deem this issue waived. ***See In re S.T.S., JR.***, ***supra***.

Nevertheless, even if not waived, AW has not convinced us that the trial court erred in determining that "mPower and AW, as sophisticated business organizations, expressly and by conduct agreed to work outside of the written contracts. Lamb testified that AW, by its actions and words, was aware, consented to, and expected mPower to perform work based on unsigned PCRs,

contrary to the requirements and terms of the MSA and SOW 6." FFCL at 99; *see also* FFCL 99-101 (setting forth testimony of Lamb). Moreover, the trial court aptly observed:

> AW and mPower were at all times aware of what was required under the signed and unsigned PCRs, whether the terms were fulfilled, and the price for the work. The parties were working together prior to SOW 6. They had familiarity with each other — so much so that AW represented that the parties can operate with agreements (often verbal or through e-mail) created outside of the formal PCR process. The parties' familiarity with each other, AW employees' admissions that contracts were created outside [of] the formal PCR process and enforceable, and voluminous documentation supporting the existence of these agreements, substantiates a finding that contracts were executed outside the formal PCR process, the terms of the contracts were reasonably certain, and the parties were aware of the terms of the respective contracts.

FFCL at 103. Thus, no relief is due.

We also reject AW's contention that the trial court "erred because it made no meaningful attempt to explain what the material terms of the supposed oral contracts were, let alone when and how the parties had agreed to them." AW's Brief at 35. We consider this issue waived, again, for lack of development, as AW does not elaborate on this assertion. *See id.*; *see also* *In re S.T.S., JR.*, *supra*.

The last piece of AW's first issue challenges the trial court's holding that AW's conduct breached both a contract and a duty of good faith and fair dealing. AW's Brief at 35. AW claims that "it is well-settled law that a breach of good faith and fair dealing claim must be predicated on conduct that is separate and apart from the conduct that allegedly breached the contract

itself.    Otherwise  the  good  faith  and  fair  dealing  claim  would  be  wholly

redundant."  ***Id.***  at 35-36 (citations omitted).  In addition, it says that "the

implied  covenant  of  good  faith  and  fair  dealing  cannot  override  an  express

term in a contract."  ***Id.***  at 36 (quoting ***Wade v. Kessler Inst.***, 798 A.2d

1251, 1259 (N.J. 2002)).    AW  argues  that  "[t]he  trial  court  ignored  these

principles, using the duty of good faith and fair dealing as a sort of general

damages enhancer for what [it] recognized as breaches of contract even for

claims made under SOW 6."  ***Id.***  (footnote omitted).  Further, it states that

the trial court's "finding regarding [AW's] invoking of its termination rights

under the MSA are a prime example of how the court relied on the *same*

*conduct* (AW's conduct in invoking termination rights under the MSA) to find

breaches of *both* the written contract (the MSA) and the implied covenant of

good  faith  and  fair  dealing."  ***Id.***  at 36-37 (footnote omitted; emphasis in

original).

Again, AW has waived this issue.  AW did not raise this specific issue in

its post-trial motion.  ***See Crespo, supra***; ***see also*** Pa.R.A.P. 2119(e).  In its

brief, it claims it preserved this issue in paragraph 25 of its post-trial motion.

***See*** AW's Brief at 35 n.54.  There, however, AW requested that, if the trial

court were not to grant it a new trial, "the [c]ourt should modify the FFCL and

the [o]rder to specify, with respect to each contract: (a) whether the [c]ourt

concludes that [AW] breached an express contractual term (and, if so, which

one) (in other words, if liability is predicated on Count I) or whether [AW's]

liability is predicated on a breach of an implied contractual term of good faith

and fair dealing (Count II); and (b) the damages attributable to each Count…." AW's Post-Trial Motion, 7/15/2016, at ¶ 25. This issue — and the relief requested — is different than the argument AW raises in its brief, asserting that the trial court "ignored New Jersey law when it held that the same conduct constituted *both* a breach of a written contract (the MSA) and a violation of the implied duty of good faith and fair dealing[,]" and used the duty of good faith and fair dealing "as a sort of general damages enhancer…." AW's Brief at 35, 36 (emphasis in original). "Even when a litigant files post-trial motions but fails to raise a certain issue, that issue is deemed waived for purposes of appellate review." ***Diamond Reo Truck Co. v. Mid-Pacific Industries, Inc.***, 806 A.2d 423, 428 (Pa. Super. 2002) (citation omitted). Consequently, this argument is also waived.

Nevertheless, even if not waived, we would reject AW's argument. In its brief, AW focuses its argument on how the termination of mPower cannot support both a breach of contract and a breach of the duty of good faith and fair dealing. ***See*** AW's Brief at 36-37. In doing so, AW fails to address the other conduct on which the trial court relied to find a breach of the duty of good faith and fair dealing aside from termination, such as AW's changing previously agreed-upon objectives and processes, and obstructing mPower's ability to complete its work. ***See*** FFCL at 139. For instance, the trial court examined AW's exercise of discretion over the parties' contract, and found that, *inter alia*, AW exploited the contract because "AW knew that if mPower was close to completing a milestone, AW could invoke its power over the

milestone approval and payment process to deny payment." *Id.* at 145-46; *see also id.* at ¶¶ 199-200 ("Knowing that its approval was required before mPower could issue milestone completion letters and invoices, AW refused to provide requisite approvals for payment. AW purposefully exploited [its] control over the milestone approval process so that mPower would not get paid for its work. This allowed AW to avoid having to pay mPower for the already over budget EID project."); *id.* at 137 (observing that "the covenant permits inquiry into a party's exercise of discretion expressly granted by a contract's terms") (citing *Seidenberg v. Summit Bank*, 791 A.2d 1068 (N.J. Super. Ct. App. Div. 2002)). AW does not offer a specific argument addressing why it believes its unreasonable and disingenuous use of its discretion in reviewing and approving milestones — which it had the ability to exercise under the literal terms of the MSA, *see* FFCL at ¶¶ 106, 112 — is not a breach of the duty of good faith and fair dealing. Thus, we would not conclude that the trial court erred on this basis.

## AW's Second Issue

In AW's second issue, it argues that "[t]he awards of costs and attorneys' fees were contrary to law, prohibited by the MSA, and unreasonable in amount[.]" AW's Brief at 38 (unnecessary capitalization and emphasis omitted). In support of this three-pronged argument, AW first advances that "[t]he trial court should not have awarded attorneys' fees because the MSA authorized an award of 'costs,' not 'fees.'" *Id.* (unnecessary capitalization, emphasis, and footnote omitted). Second, it says that "[t]he trial court should

- 31 -

not have awarded costs because the MSA's preconditions were not met." *Id.* at 45 (unnecessary capitalization, emphasis, and footnote omitted). Finally, it complains that "[t]he trial court should not have awarded attorneys' fees or costs that were disproportionate or unreasonable." *Id.* at 51 (unnecessary capitalization, emphasis, and footnote omitted).

In the first prong of its argument, AW explains that the trial court erred in concluding that the parties had contracted for the shifting of attorneys' fees in Section 2.4.3 of the MSA. *See id.* at 39-40. The Supreme Court of New Jersey has explained:

> In general, New Jersey disfavors the shifting of attorneys' fees. However, a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract. When the fee-shifting is controlled by a contractual provision, the provision should be strictly construed in light of our general policy disfavoring the award of attorneys' fees.

*Litton Industries, Inc. v. IMO Industries, Inc.*, 982 A.2d 420, 427-28 (N.J. 2009) (internal citations and quotation marks omitted).

> Here, the relevant provision of the MSA — Section 2.4.3 — provides:
>
> If any fees remain unpaid sixty (60) calendar days after AW's receipt of an invoice, Contractor will notify AW in writing of the late payments and, in Contractor's discretion, the dispute resolution procedures delineated in Section 13 shall begin to resolve payment of such fees. In the event that such matter remains unresolved following completion of the dispute resolution process delineated in Section 13, then the parties may resolve such dispute through litigation, *the losing party bearing all costs of such litigation*.

mPower's Exhibit 42 at 3 (emphasis added).

In awarding $3,596,071.75 in attorneys' fees to mPower under Section 2.4.3, the trial court explained:

Central to the dispute regarding mPower's attorney[s'] fees is the meaning of the phrase "all costs of … litigation" in [Section] 2.4.3. At the hearing on mPower's Fee Petition, AW argued that "all costs" referenced in [Section] 2.4.3 excludes reasonable attorney[s'] fees. AW pointed out that [Section] 10.1 [of the MSA], regarding indemnification, provided for indemnification for "damages or expenses (***including reasonable court costs and reasonable attorney's fees***)…." AW asserts that because "reasonable attorney's fees" were included in [Section] 10.1, but not [Section] 2.4.3, "all costs of … litigation" in [Section] 2.4.3 cannot be interpreted to include attorney[s'] fees.

This [c]ourt finds AW's argument unpersuasive. The plain meaning of the language in [Section] 2.4.3 shows that "all costs of … litigation" must be interpreted to include reasonable attorney[s'] fees. To start, the term "costs" is synonymous with "expenses." Me[r]riam[-]Webster's Ninth New Collegiate Dictionary defines "costs" to include: "***expenses*** incurred in litigation; *esp* those given by the law or court to the prevailing party against the losing party." Similarly, Black's Law Dictionary definitions of "costs" include:

3. (pl.) The ***expenses*** of litigation, prosecution, or other legal transaction, esp. those allowed in favor of one party against the other.

[Section] 10.1 clearly intends for reasonable attorney[s'] fees to be treated as "expenses." As "costs" and "expenses" are synonymous, and the MSA identifies reasonable attorney[s'] fees as expenses, attorney[s'] fees are necessarily included in "all costs of … litigation." Further, [Section] 10.1 uses the term "court costs" while [Section] 2.4.3 merely uses the term "costs." Thus, if the parties intended to limit "all costs" in [Section] 2.4.3 to solely court costs, the provision would have (or should have) specifically said so. There is no reasonable interpretation of "all costs of … litigation" that excludes reasonable attorney[s'] fees. The language of [Section] 2.4.3 makes no distinction between costs and attorney[s'] fees and provides no basis for doing so.

Trial Court Opinion, 1/5/2017, at 17-18 (footnotes omitted; emphasis in original).

On appeal, AW argues that the trial court erred because New Jersey courts "strictly construe" contractual fee-shifting provisions. *See* AW's Brief at 39 (citations omitted). It argues that the language of Section 2.4.3, "which refers only to 'costs' and omits any reference to 'fees,' cannot fairly be construed as overriding the American Rule." *Id.* at 40. AW contends that "[i]t is not enough to refer to the 'costs' of litigation. 'Costs' do not ordinarily include 'attorneys' fees.' So when parties want to agree to adopt the English Rule, they need to say so expressly." *Id.* at 41. AW further points out that "the parties *did* insert language authorizing an award of attorney[s'] fees when describing two types of disputes to which they did want fee-shifting to apply[,]" specifically Sections 10.1 and 10.2. *Id.* (emphasis in original).[20] Thus, AW insists that "the parties thought that an award of attorneys' fees should be available only in the specific circumstances that they had identified in Sections 10.1 and 10.2 of the MSA, and not in other circumstances such as those at issue here." *Id.* at 42 (internal citations omitted).

_____

[20] Section 10.2 — which was raised by AW below but not mentioned by the trial court in its analysis, *supra* — governs indemnification for intellectual property claims, and states that "***Contractor shall pay all liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees)*** incurred in connection with any such claims or actions…." mPower's Exhibit 42 at 12 (emphasis added).

We agree with AW. New Jersey law requires that the contract *expressly* provide for the recovery of attorneys' fees. ***See Litton***, ***supra.*** Here, Section 2.4.3 fails to do so expressly, and — at best — Section 2.4.3 is ambiguous on this matter. Accordingly, we reverse the award of attorneys' fees.[21]

In the second prong of its argument, AW conveys that "the trial court should not have awarded costs because the MSA's preconditions were not met." AW's Brief at 45 (unnecessary capitalization, emphasis, and footnote omitted). AW claims that, pursuant to Section 2.4.3, *supra*, and the dispute resolution procedure described in the MSA, mPower had to meet six preconditions before receiving an award of costs, including, *inter alia*, that mPower's invoice was received by AW and remained unpaid for 60 days, which mPower failed to do. ***Id.*** at 45-46. It further complains that the trial court "awarded costs that did not arise out of 'such litigation' of 'such dispute[,]'" such as costs related to mPower's defending AW's counterclaim and prosecuting its claim against VDX. ***Id.*** at 48. In addition, AW insists that, "to the extent fees related to work done in furtherance of claims (or damages) that were outside of the parties' written contract…, Section 2.4.3 cannot even be said to apply." ***Id.*** at 49. It also says that, even if some costs were

---

[21] mPower argues that, "[w]hile the trial court correctly found mPower's attorneys' fees recoverable under the MSA, should this Court find otherwise, mPower should still be entitled to attorneys' fees pursuant to New Jersey's frivolous litigation statute." mPower's Brief at 65 (footnote omitted). However, mPower does not demonstrate to us that it raised this issue before the trial court, and we will not address it in the first instance. Notwithstanding, nothing in this memorandum precludes mPower from attempting to raise it on remand.

properly awarded, mPower did not submit competent evidence to support its request, and AW argues that the trial court "should not have created a potentially perpetual process for seeking costs that are incurred after judgment is entered." *Id.* at 50.

In addressing these issues, the trial court explained:

[Section] 2.4.3 does include several conditions precedent to granting the prevailing party "all costs of … litigation." Namely, that the dispute involve invoices unpaid to mPower for over 60 days, and that mPower complete the dispute resolution process detailed in Section 13 of the MSA prior to incurring legal fees. AW argues that mPower is not entitled to any fees under [Section] 2.4.3 because: (1) the dispute is not over mPower invoices unpaid for 60 days, and mPower did not submit any written notice of late payment to AW; and (2) that mPower failed to fully complete the dispute resolution procedures outlined in Section 13 of the MSA before commencing this litigation. Even if mPower did not fully comply with the conditions precedent in [Section] 2.4.3, this is not a bar to mPower's recovery … under [Section] 2.4.3. Under New Jersey law, a party must be excused from performance of a condition precedent where "its performance is prevented or hindered by a breach of the obligor's duty of good faith and fair dealing."[27] A party must also be estopped from asserting noncompliance with a condition precedent as a defense where that party's conduct made performance of the condition precedent impossible.[28]

> [27] *See Allstate Redevelopment Corp. v. Summit Associates, Inc.*, 502 A.2d 1137, 1140 (N.J. Super. App. Div. 1985).

> [28] *See Antonelli Const. v. Milstead*, 112 A.2d 608, 612 (N.J. Super. Law Div. 1955) (finding defendant waived condition precedent where defendant's conduct rendered performance of condition precedent impossible).

The FFCL includes a detailed analysis of how AW, in bad faith, engaged in obstructive, and evasive conduct designed to prevent mPower from submitting milestone letters and other required documentation to be paid for [its] work. … The FFCL additionally outlines how mPower attempted to engage in dispute resolution

procedures prior to commencing litigation. However, mPower's efforts were pointless, as AW never intended to participate in the dispute resolution process in good faith. Thus, to the extent mPower did not comply with the conditions precedent in [Section] 2.4.3, it was AW's conduct that caused the noncompliance, and mPower was excused from performance.

Lastly, AW argues that mPower cannot recover [costs] incurred in connection with AW's counterclaims under the MSA. However, upon a plain reading of [S]ection … 2.4.3, there is no basis for treating AW's counterclaims differently than mPower's claims. As stated above, [Section] 2.4.3 provides for the reimbursement of "all costs of such litigation" to the prevailing party. AW's counterclaims arose from the same MSA under which mPower brought its claims for breach of contract and breach of the duty of good faith and fair dealing. The phrase "all costs of such litigation" includes not only mPower's affirmative claims, but any counterclaims or crossclaims that arise in connection as well. Nothing in the language of [Section] 2.4.3 indicates an intention to limit [Section] 2.4.3 to litigation of mPower's affirmative claims against AW.

…

As was outlined in the FFCL…, AW's [c]ounterclaims had no merit and were unsupported by credible evidence at trial. … AW's counterclaims put invoices directly at issue by averring that mPower failed to adhere to the milestone completion process before submitting invoices for work. In sum, AW's [c]ounterclaims were frivolous and propounded solely to impede mPower's pursuit of its own claims. There is no reason, legally or factually, that mPower would not be entitled to reimbursement for defending AW's counterclaims.

Further, mPower is also entitled to [costs] incurred with [its] third-party claim against VDX. The genesis of mPower['s] third-party claim against VDX was AW's frivolous counterclaims against mPower…. Had AW not initiated the meritless counterclaims against mPower…, mPower … would not have initiated the third-party claim against VDX. Under these circumstances (where AW is driving up the costs of litigation)[,] there is no reason, factually, legally, or logically, that mPower … would not be entitled to reimbursement of … costs for its third-party claims against VDX.

Trial Court Opinion, 1/5/2017, at 18-20 (footnotes omitted).

We agree with the trial court's analysis.[22] We also deem the $445,806.16 in costs awarded reasonable, as AW does not proffer a developed argument on this claim to convince us otherwise. **See** AW's Brief at 49-50 (discussing purported problems with evidence presented relating to amount of attorneys' fees, not costs). We additionally reject AW's argument that the trial court should not have created a "potentially perpetual process for seeking costs" incurred after judgment was entered, as the language of Section 2.4.3 does not support that litigation was considered complete at the time judgment was entered. **See id.** at 50; **see also** Section 2.4.3, **supra** (stating that "the parties may resolve such dispute through litigation, the losing party bearing all costs of such litigation"). Accordingly, we affirm the trial court's award of costs to mPower.

Finally, AW argues that "[t]he trial court should not have awarded attorneys' fees or costs that were disproportionate or unreasonable." AW's Brief at 51 (unnecessary capitalization, emphasis, and footnote omitted). AW claims that the trial court's award was "grossly disproportionate to the actual amount in controversy." **Id.** As AW's argument primarily relates to the amount of attorneys' fees awarded, not costs, we do not address this issue. **See id.** at 51, 52 (advancing that "many of the entries for fees did not provide

---

[22] We also note that AW does not present legal authority to rebut the trial court's conclusion that mPower was excused from performing the conditions precedent. **See** AW's Brief at 45-51; AW's Reply Brief at 26-27.

any basis for awarding fees" and pointing out the items for which mPower had recovered attorneys' fees).

### AW's Third Issue & mPower's First Issue

In its third and final issue, AW argues that that the trial court awarded the wrong amount of post-judgment interest on the verdict and cost award. *Id.* at 54. Because mPower also raises an issue relating to post-judgment interest in its cross-appeal, we address both issues together. *See* mPower's Brief at 2.

With respect to post-judgment interest, the trial court explained the award, and the rationale behind it, as follows:

> On July 1, 2016, this [c]ourt entered a [v]erdict in favor of mPower. On July 11, 2016, mPower filed a [p]etition to [m]old the [v]erdict to include pre- and post-judgment interest. On July 11, 2016, mPower also filed a [p]etition for attorney[s'] fees and costs. On September 12, 2016, this [c]ourt entered an order directing AW to reimburse mPower for its reasonable legal fees and expenses. Despite this [c]ourt['s] having not yet ruled on mPower's [p]ost-[t]rial [m]otion to [m]old the [v]erdict, mPower filed a *praecipe* with the Prothonotary to enter the judgment in its favor.

> On September 27, 2016, based on that *praecipe*, the Prothonotary entered a void judgment in mPower's favor. The [p]ost-[t]rial [m]otion to [m]old the [v]erdict was still outstanding and therefore there was no final judgment for the Superior Court to consider on appeal. It was not until April 3, 2018 (after [the Pennsylvania] Supreme Court denied the [p]etition to [a]ppeal) that this case was remanded to this [c]ourt for this [c]ourt to make the judgment final by ruling on the [m]otion to [m]old the [v]erdict.

Pennsylvania law requires a judgment for a specific sum of money to bear post-judgment interest.[23] 42 Pa.C.S. § 8101 states, "[e]xcept as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award.["]

A judgment is "[a] court's final determination of the rights and obligations of the parties in a case."[88] On the first [a]ppeal, the Superior Court determined that there was no final judgment entered in this case because mPower's [p]ost-[t]rial [m]otion was pending in the trial court when mPower filed a *praecipe* to enter judgment.

> [88] JUDGMENT, Black's Law Dictionary (10th ed. 2014).

"Post[-]judgment interest serves two important functions — it compensates the judgment creditor for the loss of the use of the money until the judgment is paid and it acts as an incentive for the judgment debtor to pay the judgment promptly."[90] During the time this case was in the appellate courts through error, AW could not pay the judgment[;] therefore[,] the second function of post[-]judgment interest, incentive for prompt payment, was not possible.

> [90] ***Lockley***[, 66 A.3d at 327].

An improper *praecipe* of the judgment resulted in approximately 19 months of "delay" in the appellate courts where those appellate courts did not and could not examine the merits of this case. It would defy justice to allow mPower to benefit from its own error and AW should not have to pay interest during a time period when appellate review of the case was not proper.

---

[23] In applying Pennsylvania law, the trial court explained that "[p]re- and post-judgment interest are procedural matters governed by the forum state's laws. The Superior Court of Pennsylvania has explicitly held that 'post-judgment interest is properly characterized as a matter of procedure, rather than one of substantive law. As a result, Pennsylvania courts should look to Pennsylvania law when assessing post-judgment interest…[.]'" TCO at 16-17 (quoting ***Lockley v. CSX Transp. Inc.***, 66 A.3d 322, 327-28 (Pa. Super. 2013)). Neither party disputes that Pennsylvania law should apply here.

Typically, post-judgment interest should accrue from the date of the verdict until the day the judgment is paid. If the losing party decides to appeal the trial court's verdict, that party has chosen to delay payment in the hopes that the appellate courts will reverse the trial court's decision. In this case, the delay of the appeal, and therefore payment by AW, was not caused by AW's own choice to appeal, but by mPower's improper *praecipe*.

Post-judgment interest shall restart accrual on April 3, 2018, the date the Supreme Court denied the [p]etition for [a]ppeal and remanded this case to this [c]ourt. As of that date, this case was before this [c]ourt to rule on the [m]otion to [m]old the [v]erdict[,] and AW could then decide either to pay mPower the judgment it had been awarded or to appeal for a second time.

Justice requires AW be exempt from paying post-judgment interest during the delay caused by mPower's improper *praecipe*, from September 27, 2016 to April 3, 2018.

TCO at 20-22 (footnotes omitted).

As mentioned *supra*, both parties claim that the trial court erred in some respect when calculating post-judgment interest. **See** AW's Brief at 54; mPower's Brief at 71. We consider mPower's argument first.

mPower argues that the trial court erred by disallowing "post-judgment interest between September 27, 2016 (the date of mPower's original *praecipe* for judgment) and April 3, 2018 (the date the [Pennsylvania] Supreme Court denied AW's petition for allowance of appeal)…." mPower's Brief at 70. It argues that "post-judgment interest is *mandatory* and not subject to discretion where a verdict is entered for a sum certain." **Id.** at 71 (citations omitted; emphasis in original). Further, it states that, "[n]otwithstanding, if a court is permitted to use discretion, mPower respectfully contends the trial court erred in not taking into account that it was AW's actions, particularly through its initial duplicative notices of appeal and subsequent filings, that

prevented the trial court from having jurisdiction to rule on mPower's [m]otion to [m]old [v]erdict." *Id.* at 72.

We agree with mPower that the trial court erred in disallowing post-judgment interest. To the extent a trial court may deny post-judgment interest in cases of injustice, mPower's conduct did not warrant the trial court's eliminating post-judgment interest for the nineteen-month appeal period, as a great deal of the blame for the delay falls on AW.

Specifically, to rebut mPower's argument that post-judgment interest is mandatory where damages are ascertainable under 42 Pa.C.S. § 8101, AW cites to the case *Printed Terry Finishing Co., Inc. v. City of Lebanon*, 399 A.2d 732 (Pa. Super. 1979), in which this Court determined that post-judgment interest on a reduced verdict following a new trial on damages should not run from the date of the original verdict when the new trial was necessitated because of the misconduct of the verdict winner's counsel. *Id.* at 732. In a previous appeal in that case, this Court had ordered a new trial on damages after the verdict winner's counsel "was seen shaking or holding the hand of a juror and whispering in the juror's ear or kissing her on the cheek" prior to the jury's returning a verdict on damages. *See id.* at 732-33. In rendering a decision on whether post-judgment interest should run from the date of the original verdict or the later, reduced verdict, we observed that:

> [F]rom our review of the law of interest on verdicts and judgments, we have determined that the factors relevant to our determination include: (1) whether the party causing delay acted in good faith, (2) whether the new trial on damages was required because we considered the original verdict "wiped out," and (3)

whether the party causing the delay had the benefit and use of the verdict amount during the delay.

*Id.* at 734-35 (internal citation omitted). We reasoned that, "[w]hile [the other party] has had full use and benefit of the smaller amount pending the outcome of the new trial on damages, we fail to see why, in fairness, [the verdict winner] should have the benefit of interest running from the date of a verdict in which we had absolutely no confidence because of [the verdict winner's] own attorney's actions." *Id.* at 735. We further noted that "the actions of [the verdict winner's] attorney rendered the original verdict a nullity." *Id.* Accordingly, we reversed the order of the trial court, which had added interest from the date of the original verdict. *Id.*

Unlike the circumstances in ***Printed Terry Finishing***, the original verdict in the case *sub judice* was not rendered a nullity or 'wiped out' following the quashed appeals. Furthermore, for the reasons set forth below, we do not agree with the trial court that mPower caused the lengthy delay or failed to act in good faith.

To begin, the facts demonstrate that AW was substantially responsible for causing the lengthy delay. Following the improper entry of judgment on September 27, 2016, AW filed a petition to strike the judgment on October 4, 2016, arguing that the judgment awarded mPower relief not authorized by the trial court's orders. On October 7, 2016, before the trial court disposed of its petition to strike, AW filed two notices of appeal. As a result, the trial court explained that, "[u]pon AW's filing of [a] [n]otice of [a]ppeal, this [c]ourt determined that it no longer had jurisdiction to consider AW's [p]etition to

[s]trike [j]udgment." Trial Court Opinion, 1/5/2017, at 4. Consequently, on November 15, 2016, the trial court "circulated a letter to all parties advising that it would not consider AW's [p]etition to [s]trike [j]udgment for lack of jurisdiction." *Id.* While mPower should not have filed the improper *praecipe*, AW's filing of a notice of appeal while its petition to strike remained pending instigated the lengthy delay. As soon as AW filed its notice of appeal, the trial court determined that it was divested of jurisdiction to act on the petition to strike and remedy the defective judgment. Moreover, by filing the petition to strike in the first place, AW recognized that mPower's *praecipe* was inappropriate, yet it proceeded to divest the trial court of jurisdiction anyway by appealing.[24]

Additionally, after this Court quashed all of the parties' appeals, AW filed an application for panel and *en banc* reargument for the appeal docketed at 3156 EDA 2016, arguing that this appeal was taken from an order granting attorneys' fees, which it said was ancillary to the judgment and separately appealable. This Court denied AW's application. Thereafter, on May 24, 2017, AW filed a petition for allowance of appeal to our Supreme Court, which the

_____

[24] We reject AW's argument that it filed its October 7, 2016 notices of appeal as a precaution. *See* AW's Brief at 12 ("[AW] moved to strike the defective judgment, but, when the judgment was not stricken and no briefing was scheduled, filed a protective notice of appeal….") (citations omitted). As mPower points out, "[j]ust three days after AW filed its petition to strike the original judgment, AW filed duplicative notices of appeal …. [] AW **still had nearly three weeks to file an appeal from the judgment**. If AW was concerned about losing any appellate rights, it could have filed its petition on an emergency basis. AW did not do so." mPower's Reply Brief at 15 (emphasis added; citations omitted).

Court denied on April 3, 2018. Again, mPower did not cause this nearly year-long delay, but rather AW did.

It is also unclear that mPower acted in bad faith in filing the *praecipe*. While it was improper for it to do so, mPower explains it "entered judgment before the trial court ruled on the [m]otion to [m]old [v]erdict because the [m]otion was ministerial and did not request any substantive relief, as the trial court had already awarded 'all statutory interest.'" mPower's Reply Brief at 14 (citation omitted).[25] Further, it did not believe it had to file any motion regarding post-judgment interest because it thought the trial court was required by statute to award post-judgment interest. *Id.*; *see also* mPower's Brief at 71 (stating that "a plain reading of [42 Pa.C.S. § 8101] establishes that post-judgment interest is *mandatory* and not subject to discretion where a verdict is entered for a sum certain") (emphasis in original; citations omitted). In contrast to the verdict winner's attorney in *Printed Terry Finishing*, who failed to provide a satisfactory explanation for his encounter with the juror, mPower proffers a plausible justification for its actions. *See Printed Terry Finishing*, 399 A.2d at 735. Accordingly, we determine that

---

[25] We note, however, that the trial court had awarded pre-judgment interest to mPower in its verdict, *not* post-judgment interest. Order, 7/1/2016, at 1.

the trial court erred in disallowing post-judgment interest between September 27, 2016 and April 3, 2018.[26]

### mPower's Second Issue

In mPower's second issue, it contends that the trial court "abused its discretion when it found mPower packaged only 29 applications, as the competent evidence establishes mPower packaged 135 applications." mPower's Brief at 73 (unnecessary capitalization and emphasis omitted).[27] mPower avers that "[t]he competent evidence at trial establishes mPower packaged [77] applications that (a) passed UAT and/or (b) were being used in AW's live network, which necessarily means the application was successfully packaged." *Id.* at 74 (citations omitted). Furthermore, mPower claims that AW "obstructed mPower's ability to meet packaging milestones[,]" and that the trial court should have awarded it "damages associated with packages

_____

[26] Given this disposition, we need not address AW's last issue, in which it asks us to correct an error in the trial court's post-judgment interest award. *See* AW's Brief at 54 (noting that the trial court "mistakenly awarded interest for six months of the nineteen-month period, and it awarded interest on the award of costs and attorneys' fees for the entire nineteen months").

[27] By way of background, mPower explains that:

> Under SOW 6, mPower was to package applications…. After packaging, an application moved to AW's virtual environment where it would be tested twice — unit testing ("UT") (by mPower) and then, user acceptance testing ("UAT") (by AW). A packaged application qualified for payment when it successfully passed UAT. A package was "deemed accepted" if AW did not UAT it within fifteen days.

mPower's Brief at 73 (internal citations omitted).

mPower could have completed prior to the end of the fourteen day termination notice period if AW had not obstructed mPower from meeting the milestone completion criteria." *Id.* at 74, 75. In addition, it states that "mPower packaged [58] applications that were either (a) sent to UAT or (b) prevented from being sent to UAT due to AW's failure to timely provide necessary equipment." *Id.* at 75 (citations omitted).

No relief is due. While mPower cites to various exhibits and testimony in support of its argument, it does not adequately articulate how exactly that evidence supports a finding that mPower packaged 135 applications. *See* mPower's Brief at 74, 75. Instead, it generally says what the exhibit is, without clearly explaining to us the information contained therein and the number of packaged applications it purportedly proves. Accordingly, we see no reason to disturb the trial court's finding that mPower packaged 29 applications.

## mPower's Third Issue

In mPower's final issue, it asserts that, "if this Court determines mPower is not entitled to damages for out-of-scope work performed pursuant to requests from AW, the trial court erred by dismissing mPower's unjust enrichment claim and denying mPower's motion to amend its complaint." mPower's Brief at 75 (unnecessary capitalization and emphasis omitted). Given our disposition, we need not address this issue.

## **Conclusion**

In sum, we affirm the trial court's verdict in favor of mPower in the amount of $2,244,549.00. We also affirm the trial court's award of $445,806.16 in costs, but reverse its award of $3,596,071.75 in attorneys' fees, as they should not have been awarded pursuant to Section 2.4.3 of the MSA. Finally, we reverse the trial court's award of post-judgment interest to the extent it disallowed post-judgment interest between September 27, 2016 and April 3, 2018. We direct the trial court to award post-judgment interest for this time period.

Judgment affirmed in part and reversed in part. Case remanded. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/20/19